302 Ga. 675
FINAL COPY

S17A1363.  MUCKLE v. THE STATE.

NAHMIAS, Justice.

Appellant Malcolm Muckle was convicted of felony murder in connection with the shooting death of Travis Callaway, his accomplice in an attempted armed robbery.  In this appeal, he claims that the evidence at his trial was insufficient to support his conviction and that his trial counsel provided ineffective assistance.  Neither of those claims has merit, so we affirm.[1]

---

[1] Callaway was killed on April 4, 2012.  On July 3, 2012, an Athens-Clarke County grand jury indicted Appellant, Wilma Scott, and Desmond Hill for three counts of felony murder, attempt to commit armed robbery, aggravated assault with a deadly weapon, aggravated assault with intent to rob, and six counts of possession of a firearm during the commission of a crime.  Appellant and Hill were each also indicted for one additional count of felony murder and one additional count of possession of a firearm during the commission of a crime, as well as one count of possession of a firearm by a convicted felon.  Scott and Hill pled guilty, but neither of them testified at Appellant's trial.  Appellant was tried from August 25 to September 3, 2013.  The jury found him guilty of three counts of felony murder, attempt to commit armed robbery, and both aggravated assault counts; it acquitted him of the remaining charges.  The trial court sentenced Appellant to serve life in prison for felony murder based on attempt to commit armed robbery and merged the remaining guilty verdicts (although it should have vacated the felony murder counts, see Malcolm v. State, 263 Ga. 369, 374 (434 SE2d 479) (1993)).  Appellant filed a timely motion for new trial, which he amended with new counsel on March 4, 2016.  After an evidentiary hearing, the trial court denied the motion on May 18, 2016.  Appellant filed a timely notice of appeal, and the case was docketed in this Court for the August 2017 term and submitted for decision on the briefs.

1.    Appellant first argues that the evidence presented at his trial was legally insufficient to support his conviction.

(a)    Viewed in the light most favorable to the verdicts, the evidence showed the following. Appellant and Callaway were friends. In the days before the murder, Appellant frequently visited Callaway at the house of Callaway's fiancée, Latrice Yearby. On April 3, 2012, Callaway, Yearby, and Appellant drove together to an Avis rental car location. An acquaintance of Callaway rented a Dodge Avenger for them, with Callaway promising to reimburse him. Callaway said that he needed the rental car because Yearby's car had broken down, but Yearby testified that her car was working at the time. At Avis, Yearby overheard Appellant and Callaway discussing their plan to pick up Desmond Hill. After renting the car, Appellant, Callaway, and Yearby drove to Yearby's apartment. Appellant and Callaway left soon afterwards in the rental car. Callaway returned to Yearby's apartment for dinner, and then called Appellant from Yearby's phone. He left shortly after, telling Yearby that he had to make sure Appellant had a ride home. Callaway returned to Yearby's apartment again later that evening and changed into dark colored pants and white tennis shoes before leaving.

At about 2:00 a.m. that night, Appellant's cousin Quinici Latimore, who was known as "Bipolar," received a call from Wilma Scott asking Latimore to give her some synthetic marijuana.[2] When Scott arrived at Latimore's apartment complex, he met her outside and gave her the requested drugs. Scott then drove away and Latimore began walking back to his apartment. He heard footsteps behind him right before someone grabbed him, put an arm around his neck, and pointed a gun at his neck. Latimore described the assailant as a "thick and heavyset" person wearing a ski mask.[3] Latimore scuffled with the assailant, grabbed the gun, and started walking quickly back to his apartment with the gun.

As Latimore approached the apartment breezeway, a second masked assailant wearing a green and black coat jumped out from behind the building and shot at Latimore twice. Latimore shot back five times before he ran out of bullets. He then ran to his apartment and went inside. Latimore told both his mother and his brother, who were in the apartment, that he believed he had killed someone, but he did not call the police, because as a convicted felon, he

---

[2] Four months earlier, Scott, Hill, and Callaway had robbed Latimore of $1,000 at gunpoint. In that robbery, Scott called Latimore asking him to meet her outside his apartment. Hill and Callaway drove up and exited the car with guns drawn. Latimore did not report the robbery to the police at the time.

[3] At trial, Latimore described Appellant as "slim and skinny."

was worried that he could not legally defend himself.

At around 6:00 a.m., Yearby heard beating at her door. She opened the door and found Appellant there. Appellant asked Yearby whether she had heard from Callaway, and Yearby said no. Appellant then said that Callaway was dead. Appellant told her that he, Hill, and Callaway had driven to an apartment complex to buy some marijuana and that Callaway had gotten out of the car acting as if he did not want the others to know where he was going. Appellant then heard five gunshots, and he and Hill drove away. Hill called 911 and then took the battery out of the phone and threw the phone out of the window at a stop sign because he did not want the police to "see where they were."

Appellant and Yearby then drove to the apartment of Callaway's brother, Tavarius, and told him that Callaway was dead. Appellant gave the following account to Tavarius. He, Hill, and Callaway were "going to hit Bipolar," meaning they were going to rob him. Once they arrived at the apartment complex, all three men got into position.[4] Hill gave the signal on his phone for Callaway to approach Latimore. Then Appellant heard gunshots, he saw

---

[4] The evidence indicates that Appellant, Hill, and Callaway took two cars to Latimore's apartment complex. One car was the Dodge Avenger that Appellant and Callaway had rented the day before; the other vehicle was not described.

4

Callaway fall to the ground, and he and Hill ran away. When he and Hill returned to the scene and saw that the rental car was still in the parking lot, they knew that Callaway was dead, so they got in the other car and drove away.

The police officers who responded to Hill's 911 call found Callaway dead, lying face down in the breezeway. He was wearing a green and black camouflage jacket, white shoes and blue jeans, and he had a gun in his hand and car keys for the rental car in his front pocket. Appellant's and Callaway's fingerprints were found in the rental car. An autopsy revealed that Callaway died from a gunshot wound to the back of his head.

The day after the crimes, the police interviewed Tavarius. During the interview, Tavarius called Appellant and the conversation was recorded by the police. Appellant repeated some details of the crimes, including that the shooting had taken place in the breezeway of the apartment complex, a fact that had not yet been made public. Appellant also said that Callaway had said that he was carrying a gun, and that he met Scott at the scene.

Appellant did not testify during his trial. His main defense was that he was merely present at the crime scene and did not participate in the commission of the crimes.

5

(b)     Appellant argues first that the evidence he participated in the crimes was solely circumstantial and the State did not "exclude every other reasonable hypothesis save that of the guilt of the accused" as required by OCGA § 24-14-6.[5] Appellant asserts that another reasonable hypothesis was that Hill was the other assailant Latimore saw and Appellant was merely present in the vicinity. However, Appellant told Tavarius that he, Hill, and Callaway went together to Latimore's apartment complex with the intent to rob Latimore; he knew Callaway was armed; they all got into position when they arrived; Hill signaled for Callaway to approach Latimore; and Callaway was shot during the confrontation with the putative armed robbery victim. Even if the evidence indicated that Hill was the other assailant Latimore saw, "a person may be convicted of commission of a crime even if he or she does not directly commit the crime but, instead, '[i]ntentionally aids or abets in the commission of the crime.'" Flournoy v. State, 294 Ga. 741, 745 (755 SE2d 777) (2014) (quoting

---

[5] OCGA § 24-14-6 says in full: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." This provision of Georgia's new Evidence Code, which was in effect when this case was tried, was carried over without substantive change from OCGA § 24-4-6 of the old Code, and thus our cases applying the old provision remain good law. See, e.g., Allaben v. State, 299 Ga. 253, 254-255 (787 SE2d 711) (2016). See also Bradshaw v. State, 296 Ga. 650, 653-654 (769 SE2d 892) (2015).

6

OCGA § 16-2-20 (b), which defines parties to a crime).  See also Shepard v.

State, 300 Ga. 167, 168 (794 SE2d 121) (2016).  In his discussions with

Tavarius, Appellant admitted the main fact of the felony murder charge of which

he was convicted — that he was a party to the attempted armed robbery that

resulted in Callaway's death.  Accordingly, Appellant made not "'a mere

incriminating admission,'" but "'a confession,'" which is direct evidence of his

guilt, and "[t]his is not, therefore, a purely circumstantial case."  Merritt v. State,

292 Ga. 327, 329 (737 SE2d 673) (2013) (citation omitted).

Appellant also argues, however, that the jury should have discounted his

confession because it was not corroborated by evidence that he was more than

merely present.  Appellant is wrong.  "A confession alone, uncorroborated by

any other evidence, shall not justify a conviction," OCGA § 24-8-823, but "'no

specific manner of corroboration (of the confession) is required, and

corroboration in any particular is sufficient.'"  Graham v. State, 301 Ga. 675,

676 (804 SE2d 113) (2017) (citation omitted).[6]  The evidence corroborating

_____

[6] Like the circumstantial evidence provision, the confession corroboration requirement of OCGA § 24-8-823 was carried forward from OCGA § 24-3-53 of the old Evidence Code, and we may therefore properly rely on our precedents applying the old provision.  See, e.g., Graham, 301 Ga. at 676.

Appellant's confession includes his frequent association with Callaway in the days prior to the murder; his participation with Callaway in renting the car found at the crime scene — in which both their fingerprints were found — and their discussion of picking up Hill later on; Latimore's testimony that he exchanged gunfire with Callaway; Appellant's statement to Yearby following the shooting; and the evidence that the shooting occurred at the specific breezeway location that he identified. Viewed in the light most favorable to the verdicts, this evidence was sufficient to corroborate Appellant's confession. See Norman v. State, 298 Ga. 344, 346 (781 SE2d 784) (2016).

Furthermore, the evidence was sufficient as a matter of constitutional due process, as a rational jury could conclude from the evidence that Appellant was guilty beyond a reasonable doubt as a party to felony murder based on attempted armed robbery. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20; Sapp v. State, 300 Ga. 768, 769 (798 SE2d 226) (2017) ("While mere presence at the scene of the crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during and after the offense." (citation and punctuation omitted)); Vega v. State, 285 Ga.

32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2.    Appellant contends that his trial counsel provided ineffective assistance in failing to subpoena Hill to testify at trial.  We disagree.

> To prevail on [this claim], Appellant has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result.  See Strickland v. Washington, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984).  To prove deficient performance, Appellant must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms.  See Lupoe v. State, 300 Ga. 233, 239-240 (794 SE2d 67) (2016). . . . "[I]n examining an ineffectiveness claim, a court need not 'address both components of the inquiry if the defendant makes an insufficient showing on one.'"  Id. (citing Strickland, 466 U. S. at 697).

Stuckey v. State, 301 Ga. 767, 771 (804 SE2d 76) (2017).  In particular, trial counsel's "'decision as to which defense witnesses to call is a matter of trial strategy and tactics,'" and "'tactical errors in that regard will not constitute ineffective assistance of counsel unless those errors are unreasonable ones no competent attorney would have made under similar circumstances.'"  Watkins v. State, 285 Ga. 355, 358 (676 SE2d 196) (2009) (citation omitted).

9

At the motion for new trial hearing, both Hill and Appellant's trial counsel testified. Hill claimed that if he had been called to testify at Appellant's trial, he would have said that he did not see Appellant on the night of the crimes. Trial counsel explained that he was concerned that this testimony would have conflicted with the defense strategy of convincing the jury that Appellant was merely present at the scene of the crimes; indeed, Hill's putative testimony was inconsistent with Appellant's own statements to Yearby and Tavarius, one of which was recorded. Counsel was also concerned about Hill's credibility due to his extensive criminal history; in addition, Hill had face tattoos that said "F*ck Y'all, Doing Me!" The decision not to call Hill was a reasonable strategic one under the circumstances, not deficient performance. See Watkins, supra. Thus, Appellant's ineffective assistance claim fails.

Judgment affirmed. All the Justices concur.

10

Decided December 11, 2017.

Murder. Clarke Superior Court. Before Judge Stephens.

<u>Margaret E. Heinen</u>, for appellant.

<u>Kenneth W. Mauldin</u>, District Attorney, <u>Brian V. Patterson</u>, Assistant District Attorney; <u>Christopher M. Carr</u>, Attorney General, <u>Patricia B. Attaway Burton</u>, Deputy Attorney General, <u>Paula K. Smith</u>, Senior Assistant Attorney General, <u>Jason M. Rea</u>, Assistant Attorney General, for appellee.